### HOEY v. NEW YORK TIMES CO.

(Supreme Court, Appellate Division, First Department. May 13, 1910.)

1. LIBEL AND SLANDER (§ 50*)—PRIVILEGED COMMUNICATIONS—CRITICISMS OF PUBLIC OFFICIALS—GOOD FAITH.

   A fair and honest criticism by a newspaper of a public officer is permitted in the interest of the public welfare, and becomes defamatory only when an attack is made on the motives or character of the officer.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 149, 150; Dec. Dig. § 50.*]

2. LIBEL AND SLANDER (§ 123*)—ARTICLES LIBELOUS PER SE—SUBMISSION OF CASE TO JURY.

   One suing for libel is entitled to have his case submitted to the jury, where the article complained of is libelous per se without any innuendo.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.*]

3. LIBEL AND SLANDER (§ 123*)—ARTICLES LIBELOUS PER SE—SUBMISSION OF CASE TO JURY.

   One suing for libel is entitled to have his case submitted to the jury, where the article complained of is susceptible of the libelous meaning ascribed to it in the innuendo, and the court must leave it to the jury to determine in what sense the words in the article were used and understood by readers of ordinary intelligence.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. LIBEL AND SLANDER (§ 123\*)—ARTICLE LIBELOUS PER SE—SUBMISSION OF CASE TO JURY.**

Where newspaper articles criticising a public officer and complained of as libelous are not ambiguous, the court must decide, as a matter of law, whether the articles exceed the bounds of fair and honest criticism and are defamatory.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.\*]

**5. LIBEL AND SLANDER (§ 123\*)—ARTICLE LIBELOUS PER SE—SUBMISSION OF CASE TO JURY.**

Where newspaper articles criticising a public officer and complained of as libelous are ambiguous and are susceptible of a libelous meaning, the question whether or not they would be understood in the libelous sense is for the jury.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.\*]

**6. LIBEL AND SLANDER (§ 19\*)—ARTICLE LIBELOUS PER SE—SUBMISSION OF CASE TO JURY.**

In determining whether newspaper articles are libelous, the scope and object of the entire articles must be considered together.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 98, 99; Dec. Dig. § 19.\*]

**7. LIBEL AND SLANDER (§ 123\*)—ARTICLE LIBELOUS PER SE—SUBMISSION OF CASE TO JURY.**

A newspaper article, referring to a bill pending in the Legislature relating to the police department of the city of New York, and stating that the bill is designed to safeguard the lives and property of one-half of the state, and that those who vote against it will be noted, and a subsequent article, published after the passage of the bill, headed "Roll of Dishonor," and stating that the members of the Legislature who voted against the bill have done what they could to strengthen the league of the police with gamblers, thieves, and all sources of civil and moral corruption, and that it could not be said that the sins of 34 thugs, selected from the 30,000 criminals going about the city under police protection, are not of snow-driven purity, compared with what the 34 Greater New York assemblymen were trying and failed to do when they voted against the bill, are not libelous per se; but the court must submit to the jury to determine whether readers of ordinary intelligence would understand the articles as charging that a member of the Legislature in voting against the bill was corruptly and improperly influenced by a desire to assist the league referred to, on the theory that the articles went beyond the bounds of criticism of the act of an official and constituted an attack on his motives or character.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.\*]

Ingraham, P. J., and Clarke, J., dissenting.

Appeal from Trial Term, New York County.

Action by James J. Hoey against the New York Times Company. The complaint was dismissed at the close of plaintiff's case, and from the judgment plaintiff appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Hugo Wintner (Eugene L. Parodi and James A. Foley, on the brief), for appellant.

Alfred A. Cook (I. Maurice Wormser, on the brief), for respondent.

LAUGHLIN, J. This is an action for a libel. In the year 1907, plaintiff was a resident of the borough of Manhattan, N. Y., and conducted business therein as a real estate broker and was a member of the Assembly for the Thirteenth Assembly district. There was prior to the 7th day of March that year a bill, entitled "An act to amend the Greater New York Charter as re-enacted by chapter 466 of the Laws of 1901, in certain parts relating to the police department," which was commonly known as the "Bingham police bill," introduced in the Assembly. On that day the New York Times, a daily newspaper published by the defendant, contained an article on the editorial page, the heading of which was in heavy type, as follows:

"The Police Bill.

"The New York City police bill is on the order of third reading in the lower house, and is scheduled to come to vote this morning. To those Republican and Democratic Assemblymen, whether from up state or from this city who are minded to cast their vote against the measure a word, if they are wise should suffice.

"The bill is designed to safeguard the lives and property of one-half the state. This is a wealthy city, but just now it is a wrathful city. It is behind Commissioner Bingham in his effort to become something more than titular head of police.

"There is power within the city—and it is aroused—with which no single legislator or clique may wish to cope.

"It is rumored that the bill will be passed by the Assembly and will be killed in Senate. However the bill may fare, who so registers his vote against it to-day will be noted."

The bill was reached and passed by the Assembly by an affirmative vote of 92, with 47 members, of whom the plaintiff was one, voting in the negative. Pursuant to the editorial announcement herein quoted, the defendant published an article on the editorial page of the Times on the 8th day of March, 1907, headed in heavy-faced type, as follows:

"Roll of Dishonor.

"Despite all opposition, with a vote of 92 to 47, Commissioner Bingham's bill reorganizing the corrupt police force has passed the Assembly. Of the 47 adverse votes 32 were cast by Democratic Assemblymen misrepresenting this city, and two by the Kings Republicans, Eichhorn and Voss, the one an Odell man and the other Inspector Schmittberger's legal counsel.

"We are not prepared to say that the sins of thirty-four thugs, selected from the thirty thousand criminals that go about this city under police protection, are not of snow driven purity compared with what these thirty-four Greater New York Assemblyman were trying and failed to do. They have done what they could to strengthen the league of the police with gamblers, with harlots, with thieves, with all the sources of civil and moral corruption that the 'system' connotes."

The plaintiff alleges that these articles were maliciously published of and concerning him, and were calculated to, and did, hold him up to scorn, hatred, and ridicule, and particularly to the residents of the assembly district which he represented, to his injury and damage in his business, social standing, good name, and reputation, in the sum of $50,000. He further alleges, by way of innuendo, the following:

"That said editorials were intended to convey, and did convey, to the community at large, the impression that the plaintiff herein was guilty of malfeasance and misfeasance in office, and of conduct in direct variance with

his oath of office, and of connivance and illegal co-operation in a corrupt 'league of police,' with various criminals and disorderly persons, and that the plaintiff was an accessory to an alleged conspiracy between said police of the city of New York and said disorderly and criminal persons. That the plaintiff, in attempting 'to strengthen the league of police' with said immoral and disorderly persons, had been guilty of acts in guilt with the sins and crimes of criminals of this city."

The plaintiff gave evidence tending to show that he openly, publicly, and consistently opposed the bill, not with a view to strengthening any league of the police with gamblers, harlots, or thieves, if such league existed, as to which he had no knowledge, but because he was convinced that it was unwise legislation; that while all of the newspapers, with one exception, and many civic organizations, favored the bill, it was opposed by one newspaper and by many of his constituents and by others; and that before voting on it he endeavored to ascertain the sentiment of his constituents and found no sentiment in favor of the bill. He offered no evidence, other than the articles themselves, tending to show malice on the part of the defendant.

This appeal presents but a single question, and that is whether the second editorial article, herein quoted, exceeded the bounds of fair and honest criticism of a public official, which is privileged, or rather permitted in the interest of the public welfare, and became defamatory by impugning the motives of the plaintiff in voting against the bill. It is contended in behalf of plaintiff that it charged that his object and purpose in so voting was to strengthen the league to which reference is made in the article, and inferentially that he was actuated by unlawful and corrupt motives. The law applicable to this question is perfectly well settled. The only difference of opinion among the members of the court arises on the construction of the second editorial.

In Hamilton v. Eno, 81 N. Y. 116, which is the leading case on the subject in question in this state, Dr. Hamilton sued the defendant for libel in publishing an article in the Tribune with respect to a report which he made as an assistant inspector of the board of health, and which had been published in the City Record. It was held, in effect, that there was a right which the court designated a qualified privilege to discuss and to criticise the report and the official acts of the public official without any limitation in the absence of actual malice; but that the publication exceeded the bounds of such criticism, and became an aspersive attack upon the character and motive of the plaintiff and a recovery was sustained. Judge Folger, writing for the court and discussing certain exceptions to the charge, among other things, said:

"There are certain communications which are privileged and prima facie excusable because of the occasion; that is, they will not be deemed libelous, though the party making them may not be able to prove them to be true, and may in fact be wrong in thinking them to be so. The effect of the privilege is this: That the law will not imply malice from the fact of the publication, and without malice, express or implied, there is no libel. * * *

"The occasion that makes a communication privileged is when one has an interest in a matter, or a duty in regard to it, or there is a propriety in utterance, and he makes a statement in good faith to another, who has a like interest or duty, or to whom a like propriety attaches to hear the utterance. Van Wyck v. Aspinwall, 17 N. Y. 190; Klinck v. Colby [46 N. Y. 427, 7 Am.

Rep. 360] supra; Sunderlin v. Bradstreet, 46 N. Y. 191 [7 Am. Rep. 322]. And, in a qualified way, the occasion exists when there has been put forth a publication of general public interest, or the publication thus made in itself is one to which public interest has been invited. Then there is a right to make comment upon that publication. And like to this are the acts and conduct of public functionaries, and, of course, their official productions, when made public by themselves or in the due course of the public business.

"We think that the occasion of the defendant's publication was such as that first stated. The plaintiff had made an official report recommending a certain kind of street pavement. It was calculated to make public favor for that pavement. The official character of its author, which was impressed upon the report, made it more important and effective. If the municipal authorities should be led to adopt it, by the public favor shown to it, or the public demand for it, and use it upon the streets, that action would be at the cost of property owners, and to the public good or ill. The official report tending to this result was spread before the community in a public journal, and the common attention drawn to it. Every citizen had a right to discuss the question as publicly as the report had done so. So that the time and mode of the publication of the defendant made the occasion of it this far privileged. Such an occasion must, however, be used fairly and in good faith, with a view to the public interest and good, and without evil or malicious motive. In the case in hand, there was the report of the plaintiff, and it was his report made officially. It was, therefore, the subject of criticism as a work upon a matter of public interest, and also as the act of an official person. As a work, the defendant might question its statements of fact and deny them; he might expose misrepresentations and point out errors; he might combat its reasoning and show its conclusions ill drawn; and he might do so with satire and ridicule, so long as he directed those missiles at the report and the contents of it. But he could not attack the private character of the author; to do so would be libelous. Cooper v. Stone, 24 Wend. 442. Now, it did not affect the report or its merits, so far as the author was concerned as a private person, that he wrote what was dictated to him by the pavement company. * * *

"It is, therefore, with the report as an official act, and with its author as a public servant, that we are principally concerned. It is apparent that to say of such a matter from such a person that its statements were dictated by interested persons, and that the author was rewarded for it from their private means, is calculated to injure the official and private reputation of the author. Now one may in good faith publish the truth concerning a public officer; but, if he states that which is false and aspersive, he is liable therefor, however good his motives. A person in public office is no less to be protected than one who is a candidate for public office; and the law of libel must be the same in each case. The public have as much interest in knowing the true character of one who is seeking a place of trust as that of one who holds it. There must be as much and no more privilege of utterance as to one than the other. Yet it is the law of this state that to accuse a candidate for public office of an offense is not privileged, though the charge was made without evil motive, and in the exercise of a political right (Lewis v. Few, 5 Johns. 1); and though the libel relate to a public act of the candidate in his official place (Id.; Root v. King, 7 Cow. 613, affirmed on error brought [King v. Root] 4 Wend. 113 [21 Am. Dec. 102]). It cannot be different when the charge is against one holding an office. See Edsall v. Brooks, 17 Abb. Prac. 221. So it seems to be in other states. Com. v. Clap, 4 Mass. 163 [3 Am. Dec. 212]; Curtis v. Mussey, 6 Gray [Mass.] 261; Seely v. Blair, Wright (Ohio) 358, 683; Brewer v. Weakley, 2 Overt. (Tenn.) 99 [5 Am. Dec. 656]; Mayrant v. Richardson, 1 Nott & McC. (S. C.) 347, [9 Am. Dec. 707]. It is not needful that we go into an examination and discussion of the English decisions cited to us in behalf of the appellant, and many others that may be found in the English books. Were they uniform and consistent in stating a rule different from that to be found in the report of our own state, we would not be at liberty to follow them. When it is doubtful, if, on the whole, and after due comparison and collation, they do not assert the same principle as our own decisions, still less need we take time in reviewing them.

"We are of the opinion that the official act of a public functionary may be freely criticised, and entire freedom of expression used in argument, sarcasm, and ridicule upon the act itself; and that then the occasion will excuse everything but actual malice and evil purpose in the critic. We are of the opinion that the occasion will not of itself excuse an aspersive attack upon the character and motives of the officer; and that, to be excused, the critic must show the truth of what he has uttered of that kind."

Recently the Court of Appeals, in Triggs v. Sun Printing & Pub. Ass'n, 179 N. Y. 144, 71 N. E. 739, 66 L. R. A. 612, 103 Am. St. Rep. 841, further elucidated this rule as follows:

"The single purpose of the rule permitting fair and honest criticism is that it promotes the public good, enables the people to discern right from wrong, encourages merit, and firmly condemns and exposes the charlatan and the cheat, and hence is based upon public policy. The distinction between criticism and defamation is that criticism deals only with such things as invite public attention or call for public comment, and does not follow a public man into his private life or pry into his domestic concerns. It never attacks the individual, but only his work. A true critic never indulges in personalities, but confines himself to the merits of the subject-matter, and never takes advantage of the occasion to attain any other object beyond the fair discussion of matters of public interest and the judicious guidance of the public taste."

The rule is stated in the Encyclopedia of Law and Procedure (volume 25, pp. 243, 401) as follows:

"The interests of society require that immunity should be granted to the discussion of public affairs, and that all acts and matters of a public nature may be freely published with fitting comment or strictures. But the privilege is limited strictly to comment and criticism, and does not extend to protect false statements, unjust inferences, imputations of evil motives, or criminal conduct, and attacks upon private character; the publisher being responsible for the truth of what he alleges to be facts. * * * Comment on and criticism of the acts of public men are privileged if fair and reasonable and made in good faith. But the right to criticise does not embrace the right to make false statements of fact, to attack the private character of a public officer, or to falsely impute to him malfeasance or misconduct in office."

It follows, from this statement of the law, that if the editorial exceeded the bounds of fair and honest criticism, and was "an aspersive attack upon the character and motives" of the plaintiff, it is libelous.

It is to be borne in mind that the plaintiff was entitled to have the case submitted to the jury, either if the articles were libelous per se, without any innuendo, or if they were susceptible of the meaning ascribed to them in the innuendo, for, if libelous per se, it would be the duty of the court to so decide as a matter of law, but if ambiguous, and in any aspect of the case the articles are susceptible of the meaning ascribed to them in the innuendo, it would be the duty of the court to leave it to the jury to determine in what sense the words were used and would be understood by readers of ordinary and average intelligence, and if they would be so understood that they would be libelous. Morrison v. Smith, 177 N. Y. 386, 69 N. E. 725; Moore v. Francis et al., 121 N. Y. 199, 23 N. E. 1127, 8 L. R. A. 214, 18 Am. St. Rep. 810.

The fact that the plaintiff was a public official, and that the articles related to him in his official capacity, which gave full license to the press to discuss, to comment on, and to criticise his official action, pro-

vided the so-called "qualified privilege" was not abused by being exercised through actual malice, does not alter the rule that, if the words or articles as a whole are not ambiguous, it is for the court to decide as matter of law whether they exceeded the bounds of fair and honest criticism and became defamatory, and that, if they are ambiguous and are susceptible of the libelous meaning, then whether or not they would be understood in the libelous sense must be for the jury. I am of opinion that the articles were not necessarily libelous per se, but that it should have been left to the jury to determine whether or not readers of ordinary and average intelligence would understand the articles as charging that the plaintiff, in opposing and voting in opposition to the bill, was corruptly and improperly influenced by a desire to aid and assist the league to which reference is made, and which, if it exists, must have been founded upon bribery and corruption.

In Morrison v. Smith, supra, the Court of Appeals say:

"If the words are incapable of the meaning ascribed to them by the innuendo, and are, prima facie, not actionable, the complaint should be dismissed. If they are capable of such a meaning, however improbable it may appear, the jury should say whether they may be so understood."

In deciding the question as to whether or not the articles are libelous, the scope and object of the entire articles are to be considered together. More v. Bennett, 48 N. Y. 472, 476. The articles do not quote from the bill, and it may well be that the readers would have only such knowledge thereof as is conveyed by these articles, which state what the writer deemed to be the effect, if not the express object, of the bill. In the first editorial, the Times gave notice that, whether the bill passed or not, those who voted against it would be "noted." The second article, published after the bill had passed the Assembly, is headed in large type, "Roll of Dishonor," and, after stating the action of the Assembly on the bill, the names of the members who voted against it are published in full under the statement, "Here is the roll of dishonor." Then follows the language which it is contended by the learned counsel for the respondent relates to the effect of the defeat of the measure; but which it is claimed by counsel for appellant charged plaintiff with having been actuated by corrupt or other evil motives. Within the authorities cited, there is no limitation on just and honest criticism of the official act, and there is no liability, excepting on the theory that these articles went beyond the bounds of criticism of the official act and constituted an attack upon the motives or character of the plaintiff. The Times has pictured the consequences that would follow the defeat of the bill in any manner, no matter how seriously it would reflect on the judgment or official efficiency of those who vote against the measure; but I am of opinion that it may not be held as matter of law that the second editorial is not susceptible of the meaning that plaintiff was actuated by corrupt or other evil motives. It should, therefore, have been left to the jury to determine whether readers of ordinary and average intelligence would not understand that to be the charge made by the defendant by the publication of these editorials.

It follows, therefore, that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.

SCOTT and MILLER, JJ., concur.

INGRAHAM, P. J. (dissenting).   In the year 1907 the plaintiff was elected a member of Assembly in the Thirteenth Assembly district in the city of New York, and entered upon the discharge of his duties in the Legislature.   His course in voting against a certain bill relating to police matters in the city of New York was disapproved of by several newspapers, including the one published by the defendant, and it is in consequence of an article criticising his vote in opposition to that bill that it is claimed the defendant published a libel.   The plaintiff had been elected to represent the residents of his district in the Legislature, and as such his official acts were subject to criticism. It certainly is not libelous for the people to call their representatives to account for official action claimed to .be against the best interests of the city; it is not a libel to allege that a particular vote was against the welfare of the city.   It is settled in this state that a citizen has a right to criticise the official acts of public officials.   I agree that to say a public official acts disgracefully for private gain would be a libel, but to say that the action of a representative in the Assembly, or any other public body, is an injury to and disgraces the city or state, without imputing improper or corrupt motives, is criticism which I think comes within the qualified privilege.   The question is discussed at length in Hamilton v. Eno, 81 N. Y. 116.

There is no dispute, as I understand it, as to the law; the only question being whether this publication does as a fact charge the plaintiff with anything more than that the effect of his vote was to injure the city and sustain the lawbreakers, rather than uphold those who were trying to enforce the law.   The article stated that this plaintiff and his associates had "done what they could to strengthen the league of the police with gamblers, with harlots, with thieves, with all the sources of civil and moral corruption that the 'system' connotes," and the roll of those who voted in a way that would accomplish this purpose was called a "Roll of Dishonor."   I cannot see that there was here anything that impugned the motives of the plaintiff or charged him in any way with an improper motive in voting as he did.   It seems to me that the distinction must necessarily be between a criticism of the official conduct as to its effect upon the community and impugning the motives of the public official in the action that he has taken.   Although this article may be severe, there is nothing in it that I can see that directly charges this plaintiff with an improper motive.   What is said is that his action was against the best interests of the city and supported those who were opposed to public law and order, and that those who voted in that way composed a "Roll of Dishonor."   But there is no charge of personal corruption; no charge of an improper motive; and every word may be true, and still the plaintiff may have acted from the most conscientious motives in voting as he thought best for the public welfare.   Representative government would be impossible unless the people could freely criticise the official acts of

their representatives, and, as long as such criticism is directed towards the effect of the official acts of a public official, it cannot be a libel per se, and to support an action based on such criticism there must be an allegation of actual malice.

What was said in Triggs v. Sun Printing & Pub. Ass'n, 179 N. Y. 144, 71 N. E. 739, 66 L. R. A. 612, 103 Am. St. Rep. 841, does not apply to the right of the public to criticise one of its representatives. Whether or not this privilege exists I think is a question of law for the court and not for the jury, and to submit to the jury the question as to whether the privilege existed or whether the article impugns the plaintiff's motives would be allowing the jury to determine what is really a question of law that it is the duty of the court to determine. In order to sustain the view expressed in the prevailing opinion, the learned judge recognized that this editorial must be susceptible of a meaning that plaintiff was actuated by corrupt or other evil motives, and I cannot see that this article justifies such an inference.

I think the court was right in disposing of the question as a matter of law, and that the complaint was properly dismissed.

CLARKE, J., concurs.