BINGHAM v. GAYNOR.

(Supreme Court, Appellate Division, First Department. December 30, 1910.)

1. PLEADING (§ 80*)—ANSWER—PARTIAL DEFENSES.

Where neither of the defenses pleaded in an answer to a complaint for libel was pleaded as a partial defense, and did not specify which of the causes of action alleged it purported to answer, each must be treated as a complete defense to the entire complaint.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 162; Dec. Dig. § 80.*]

2. LIBEL AND SLANDER (§ 94*)—PLEADING—DEFENSES.

Defenses to libel were not aided by the allegation that the articles complained of were true, in the absence of facts supporting such conclusions.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 219–225; Dec. Dig. § 94.*]

3. LIBEL AND SLANDER (§ 94*)—PLEAS IN JUSTIFICATION—SUFFICIENCY.

A plea in justification of a libel must be as broad as the charge, and, in determining what the charge is, the scope and object of the whole article

must be considered, and such construction put thereon as the language used will naturally bear.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 219–225; Dec. Dig. § 94.*]

4. LIBEL AND SLANDER (§ 21*)—PUBLICATION LIBELOUS PER SE—"SCOUNDREL-ISM"—PERSON DEFAMED.

Defendant wrote and published a letter to the mayor of New York, stating that defendant had written a letter to the Governor to get redress "for the scoundrelism" hereinafter mentioned through the power of removal of city officials, but on second thought concluded to seek redress from the mayor. He then proceeded to make complaint against plaintiff as police commissioner for alleged incompetency and lawlessness in the administration of the police force of New York; the scoundrelism referred to being plaintiff's refusal as police commissioner to remove the photograph and record of a certain boy from the Rogues' Gallery; plaintiff being the only one defendant was complaining of, and his removal from office being the only redress sought. Held, that the word "scoundrelism" referred to plaintiff with sufficient certainty, and was libelous per se.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 103; Dec. Dig. § 21.*]

5. LIBEL AND SLANDER (§ 56*)—JUSTIFICATION.

In an alleged libelous letter, written and published by defendant concerning plaintiff in the exercise of his office of police commissioner, defendant charged plaintiff with doing all he could to make it impossible for a certain boy, who had been often arrested and whose picture was in the Rogues' Gallery, to lead an honest life and make an honest living, and force him instead to a life of crime. Held, that such charge was not justified by the fact that plaintiff as police commissioner, though often requested, had refused to remove the boy's photographs and measurements from the Rogues' Gallery, and that by reason thereof his subsequent arrest followed, though it appeared that his photograph had been taken and placed in the gallery without authority.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 153–156; Dec. Dig. § 56.*]

6. LIBEL AND SLANDER (§ 21*)—LIBELOUS LETTERS—CERTAINTY.

Defendant wrote and published a letter to the mayor of New York, asking the removal of plaintiff as police commissioner because of plaintiff's refusal to expunge from the Rogues' Gallery the picture and record of a certain boy. The letter, among other things, stated that incompetents, corruptionists, and sometimes buffoons were put in rulership over men on the police force and compelled them against their wish to make false arrests, etc. Held that, though such imputations might refer to others, they also included plaintiff with sufficient certainty, and were libelous per se.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 103; Dec. Dig. § 21.*]

7. LIBEL AND SLANDER (§ 56*)—LIBELOUS PUBLICATION—JUSTIFICATION.

A letter, written by defendant to the mayor of New York, seeking plaintiff's removal as police commissioner, alleged that it was an ordinary thing for the commissioner to refuse to obey the decisions of the court, and compel the police force to disobey them. It also charged that the despotism and lawlessness of the police commissioner was shocking, and that he was possessed of the most dangerous and destructive delusions that officials can entertain in a free government, namely, that he was under no legal restraint whatever, and might do as he willed, instead of only as the law permitted, and that only in the manner prescribed. Held, that such statements were libelous, and were not justified by the citation of a single instance, where it was claimed that plaintiff refused to obey the decision of the court prohibiting the photographing of prisoners be-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fore conviction, and advising a subordinate not to do so, and giving comfort and assistance to such subordinate when convicted of contempt for such disobedience.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 153–156; Dec. Dig. § 56.*]

8. LIBEL AND SLANDER (§ 97*)—JUSTIFICATION—DEMURRER.

A justification in defense of a libel, though complete as to one of the libelous charges, was nevertheless demurrable, unless it was a justification of all the libelous charges made.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 234–236; Dec. Dig. § 97.*]

9. LIBEL AND SLANDER (§ 50½*)—PRIVILEGE—PUBLICATION.

An alleged libelous letter, written by defendant to the mayor of New York, seeking plaintiff's dismissal because of alleged misconduct in the administration of his office as police commissioner, was not privileged, where defendant gave out the letter for publication before it was received by the mayor.

[Ed. Note.—For other cases, see Libel and Slander, Dec. Dig. § 50½.*]

10. LIBEL AND SLANDER (§ 48*)—ACTS CONCERNING PUBLIC OFFICIAL—PRIVILEGE.

Defendant, having written an alleged libelous letter to the mayor of New York, seeking the removal of plaintiff as police commissioner, because of plaintiff's refusal to remove the picture and record of a boy from the Rogues' Gallery, afterwards furnished to the press a communication that he had no reply to make to the commissioner, and that none was required; that the "boy's case was only one of thousands; that the despotism and lawlessness of the police commissioner is shocking to every American who knows what free government means and what it cost in property and blood of our ancestors to acquire; that Russian methods will not be further tolerated; that they have been so long practiced that we are losing all sense of the dignity of free men and are becoming debased;" that it was a bad thing to see a great and indulgent city in the rulership of persons who think they have all the residents "by the back of the neck." Held, that such communication was not privileged.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 144–147; Dec. Dig. § 48.*]

11. LIBEL AND SLANDER (§ 48*)—PRIVILEGE—CRITICISM OF PUBLIC OFFICER.

Where an alleged libelous publication concerning plaintiff in the administration of his office as police commissioner charged him with scoundrelism, incompetency, corruption, and being a buffoon, and also with being a despot and lawless, and possessed of the most dangerous and destructive delusion officials can entertain in a free government, it was not privileged as a fair comment on plaintiff's acts, under the rule that the character and motives of an official criticised may not be attacked under the guise of privilege.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 144–147; Dec. Dig. § 48.*]

Miller and Dowling, JJ., dissenting.

Appeal from Special Term, New York County.

Action by Theodore A. Bingham against William J. Gaynor. From an order (68 Misc. Rep. 565, 125 N. Y. Supp. 216) overruling a demurrer to defendant's answer, plaintiff appeals. Reversed, and demurrer sustained, with leave to amend.

Action to recover damages for an alleged libel. The complaint alleges that at the times mentioned the plaintiff was the police commissioner of the city of New York, appointed as such by the mayor, and that the defendant mali-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ciously wrote and sent to the mayor, and furnished to the public press copies of, a letter which is as follows:

"Brooklyn, N. Y., May 29, 1909.

"The Hon. George B. McClellan, Mayor of New York—Sir: I had written a letter to the Governor of the state to get redress for the scoundrelism hereinafter mentioned through the power of removal of city officials which he possesses, but on second thought I concluded to withhold it, and first ask for such redress through you.

"On June 16, 1907, George B. Duffy, 19 years old, son of George E. Duffy, of 237 Wyckoff street, Brooklyn, was arrested near his home by a police officer without a warrant and locked up overnight. No charge of any criminal offense was made against him, but only that he was 'a suspicious person.' He had never been arrested before. He had lived at home in the neighborhood all his life, and could be found or identified at any hour.

"The next morning he was taken to Police Headquarters, or Central Office, and subjected to the routine and indignities of a felon. He was stripped, measured and photographed, and his picture was hung up in the Rogues' Gallery, and his name entered in the index of felons. The next day he was taken before a magistrate and discharged. No complaint of any kind was made against him. It seems that the glass of a saloon had been broken some days before and some whisky taken out. The saloonkeeper, who was brought to court by the police to look at him, could make no complaint against him, and disavowed having anything to do with the arrest.

"It was not long before it spread abroad that his picture was in the Rogues' Gallery, and he was gibed and twitted of it in the streets. His father tried every way to have the picture taken down and the record destroyed, and failing he came to me. I wrote several friendly letters to the Police Commissioner calling his attention to the illegality of the matter and asking that he cause the picture to be taken down and the record to be erased, but he finally refused. Instead of helping the boy, my efforts only hurt him, as you will see presently.

"The object of putting a person in the 'Rogues' Gallery' and recording him as a criminal is to have the police force familiarized with his personal appearance, name and residence, in order to watch and hunt him as one who has settled on a life of crime, and become a pest to society. The natural result follows, and followed in this boy's case. He was marked by the police. After being put in the 'Rogues' Gallery' and indexed as a felon, he was arrested again and again on sight and without warrant or cause, except that he was in the 'Rogues' Gallery,' and therefore to be hunted.

"On November 26, 1907, he was arrested in the street near his home of an evening, and locked up overnight in a cell with filthy persons. When taken before the magistrate next day no criminal charge could be made against him. He was, therefore, charged by the police with violating an ordinance by obstructing the street, and discharged with a suspended sentence. He did not obstruct the street except by being on it. The charge is a stock one, used for lack of a truthful one. It is neither a felony nor a misdemeanor, but one of those small things not included among crimes at all which magistrates are allowed to summarily dispose of, and the boy felt it was useless to contest it. After being locked up all night he was glad to get away without any dispute.

"Just think of the boys of the city being locked up, and brought into court with felons on such a charge, and trumped up at that! What effect must such an experience have on the future of the average boy?

"On September 22, 1908, he was again arrested in the street and locked up overnight on the terrible charge by the police of assault and highway robbery. His parents were shocked. Two days later he was brought before a magistrate. The man who claimed to have been assaulted and robbed was brought there to identify him, but immediately said on seeing him that he was not the culprit; that he was robbed by a man, not by a boy; and he was discharged.

"The fact was then revealed there that the police had taken the complainant through the 'Rogues' Gallery' and pointed out this boy's picture to him, and got from him that the photograph resembled the person who had robbed him, and on that alone, without taking the complainant to see this boy or going before a magistrate or using any precaution whatever, they arrested him

and locked him up with felons. He was again arrested in a similar way and discharged.

"On last Sunday morning he got home from his work at about 7 o'clock. He works on a milk route delivering milk, which is night and early morning work, as you know. He washed and dressed and went to church. Afterward he went to bed, as he has to sleep some part of the day on account of his night occupation. In the evening he went out to visit a young lady.

"He was arrested at 8 o'clock p. m., on the street in the sight of many by a Headquarters detective, in plain clothes, who told him his picture was in the 'Rogues' Gallery,' and who took him to the police station and locked him up in a cell overnight. The false and malicious charge of vagrancy was entered on the station blotter against this boy, who works every day of his life and has a refined and good home with his parents.

"Monday morning he was taken to Police Headquarters, or Central Office. A squad of about fifteen detectives, with their faces masked, were called in to look at him. They yelled at him and shoved him about. The officer at the desk told them his name, and that he was a well-known thief, and added with a sneer, that 'he thought he had pull enough to get his picture out of the Rogues' Gallery,' and, turning to the boy, told him he might as well get that idea out of his head at once.

"This had reference to my poor efforts with the Police Commissioner which I have already stated. I am fully conscious of my lack of power to put a stop to the outrageous violations of our laws and system of free government which occur unchecked in this city daily and are fast debasing us. Such occurrences often make me wish that I had the power even for a month or two. In that time official lawlessness could be stopped and Anglo-Saxon government restored to the city, at all events.

"I give the words as the boy gives them to me. After this outrageous treatment he was taken to court before magistrate Furlong at 10 o'clock. No charge whatever was made against him there, and he was discharged. Meanwhile he had been absent from his work. A messenger came to his father's house for him from his employer at 3 o'clock in the morning. He should have been at work at 2 o'clock. He could not be found and was unable to send any word home.

"Need I say that this boy must get redress from this criminal official wrongdoing and oppression or be ruined for life? He has a position in which he earns $18 a week, but he and his parents have lived in daily dread of the day his employer would learn that his picture is in the 'Rogues' Gallery' and discharge him. Do you not know how hard life is, and how most of the people of this great city, over which in God's providence you rule, have to struggle to live or make both ends meet?

"This boy's family is a most excellent one, and the anxiety of his father and mother for his future, pilloried and disgraced as he now is, can be understood by every good father and mother. The Police Commissioner is doing all he can to make it impossible for him to lead an honest life and make an honest living, and to force him instead to a life of crime.

"Many thousands of false arrests are being made here annually, and many boys begin their downward career from the humiliation and debasement of being locked up in a cell overnight without any cause or for some trifle. The men on the police force do not want to do these and like things, but are forced to by the incompetents, corruptionists, and sometimes buffoons who are put in rulership over them and suffered to run their course unchecked.

"No free people can be ruled in a lawless manner. Those put into office and authority should first of all obey the laws which regulate and limit their official conduct and powers. In that way only can they effectively enforce the laws against others. Ours is a government of laws and not of men. But it depends on freedom from unlawful official interference and freedom of lawful speech which are guaranteed by our Constitution and cannot exist without both.

"May I remind you of some pertinent things which you already know, but which have, it would seem, escaped your attention. In November, 1907, the police authorities lawlessly seized persons who were at large, under bail on indictment in Kings county and had them photographed and measured and

their pictures hung in the Rogues' Gallery. There was a wide protest against this open and defiant assault and violation of law. A citizen, Mr. Charles N. Hyde, wrote a letter to your honor, pointing out its illegality, except in the case of convicted persons, and asked you to stop the Police Commissioner, as you have ample power to do. May I remind you that you only acknowledged receipt of his letter and stated that it had been referred to the Police Commissioner, who was the offender, and that the same illegal conduct has gone on openly and notoriously from day to day to this hour.

"Moreover, the next month (in December, 1907) our Supreme Court here, Mr. Justice Burr presiding, decided that the police officials have no authority to measure and photograph persons and put their pictures in the Rogues' Gallery, unless on conviction of crime and sentence to prison, as the statutes expressly provide. Laws 1896, c. 440; Laws 1889, c. 382, § 40. The case is Gow v. Bingham, reported in 57 Miscellaneous Reports, at page 66.

"The matter was thus put beyond dispute, for the police and all executive officers have to conform to the decisions of the courts. But it is an ordinary thing for the Police Commissioner to refuse to obey the decisions of the courts and compel the police force to disobey them. Many instances can be cited. In this case he openly and ostentatiously set himself above the law. The next day after the decision he made the public announcement that he would not obey it, and he has continued to this hour to disobey it, without reprimand or check, much less removal.

"He is possessed of the most dangerous and destructive delusion that officials can entertain in a free government, namely, that he is under no legal restraint whatever, but may do as he wills, instead of only what the law permits, and that only in the manner it prescribes.

"Respectfully yours,     ·                    W. J. Gaynor."

For a second cause of action, the complaint alleges that the defendant maliciously composed and furnished to the public press copies of the following:

"I have no reply to make to the Police Commissioner and none is required. He publishes the letters showing that I have exhausted every effort with him to have this boy's picture (referring to the said George B. Duffy) taken quietly out of the Rogues' Gallery, and that he refused. The whole matter is one of record and plain to any one. Not only has this boy not been convicted of any crime, which is a prerequisite by law to his being put in the Rogues' Gallery, but they are unable to even make a charge against him in the police court.

"But this boy's case is only that of thousands and thousands. The despotism and lawlessness of the Police Commissioner is shocking to every American who knows what free government means and what it cost in property and blood of our ancestors to acquire it. Russian methods will not be further tolerated here. They have been so long practiced that we are losing all sense of the dignity of free men and are becoming debased. Mayors and Police Commissioners are no more above the law than is any one else. The law sets limits to the powers of public officers, and the first thing of all is for them to obey the law and keep within such limits. Officials under a free government cannot do as they please. This is a government of law and not men, and an official who sets himself up above the law is more dangerous to the perpetuity of our institutions and to public order and happiness than the worst criminal.

"Suppose all public officials, from the President down, should kick aside the restraints put upon them by law and do as they pleased; do you not see that that is despotism? Ours is a government of carefully limited powers to every official. The contrary is despotism. Despotism is that officials do as they please, instead of only as the law limits and prescribes their conduct and powers. It is a sad thing to see a great and intelligent city in the rulership of persons who think they have us all by the back of the neck.".

The answer, besides denials and matter in mitigation, sets forth two defenses, to which the plaintiff demurred on the ground of insufficiency. The demurrer was overruled, and the plaintiff appeals.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

E. C. Crowley, for appellant.
Stephen C. Baldwin, for respondent.

McLAUGHLIN, J.   The first defense demurred to alleges, in substance, that the defendant, before writing the letter addressed to the mayor, several times requested the plaintiff to have the picture and measurements of the Duffy boy removed from the Rogues' Gallery, which the plaintiff refused to do, notwithstanding a decision of the Supreme Court, in an action to which the plaintiff was a party, to the effect that such picture and measurements could not legally be retained; that the process of measuring and photographing persons arrested, but not convicted, had, under the direction of the plaintiff, been continued after that decison; that the plaintiff had advised a police lieutenant named Kuhne, who had been convicted of contempt of court, to resist the court orders and to refuse to apologize and thereby purge himself of contempt; and, "believing that the plaintiff was a person without any conception of his duties and without respect or regard for the laws," the defendant wrote the letter complained of to the mayor, the superior officer of the plaintiff; that the matters of fact stated" in the letter and the statement "are true, and the opinion therein fair comment on the said acts of the plaintiff, and only such as to bring properly before the said Mayor the official misconduct of the plaintiff, and were and are without malice; and the said statement and the said letter were privileged."

The second defense demurred to alleges that the statements in the articles complained of are true; that in November, 1907, the police authorities, under the command of the plaintiff, police commissioner, photographed and measured persons who had been arrested, but not convicted of crime, and in the case of one Jenkins photographed and measured a man who was at large on bail; that the illegality of these proceedings was called to the attention of the plaintiff; that the plaintiff "advised one August Kuhne to defy the judgment of the Supreme Court convicting him of contempt of court for refusing to obey a writ of habeas corpus requiring him to produce the body of the said Frank Jenkins, the offense consisting of photographing said Jenkins subsequent to the service of said writ, the purpose of which had been to prevent such an illegal act," paid Kuhne's fine therefor, granted him leave of absence from duty while he was serving a term of 30 days' imprisonment imposed by the court, and promised to promote him thereafter to the office of police captain; the facts concerning the numerous arrests of Duffy and defendant's letters relative thereto, as substantially set forth in defendant's letter to the mayor; that the plaintiff had received from the proper officials the full record of the arrests, charges, and disposition of the charges made against Duffy, which showed no conviction of any crime; that, notwithstanding, the plaintiff wrote to the defendant refusing, and openly refused, to remove the photograph and measurements, and stated that the treatment of Duffy was justified; and that on or about February 6, 1906, an injunction

was granted by the Supreme Court restraining defendant and his subordinates from entering certain specified premises, and that with full knowledge of such injunction the plaintiff and his subordinates, acting under his direction, violated and wholly disregarded the same, and entered said premises, annoyed, harassed, and oppressed the tenants.

Neither of the defenses is pleaded as a partial defense, nor does either specify which of the causes of action alleged it purports to answer. Upon demurrer, therefore, each must be treated as a complete defense to the entire complaint and its sufficiency determined when tested in that way. Thompson v. Halbert, 109 N. Y. 329, 16 N. E. 675; Lapetina v. Santangelo, 124 App. Div. 519, 108 N. Y. Supp. 975; Price v. Derbyshire Coffee Co., 128 App. Div. 472, 112 N. Y. Supp. 830. The defenses are not aided in any way by the allegation that the articles complained of are true, because no facts are stated in such allegation. It is a conclusion, and nothing more. Wachter v. Quenzer, 29 N. Y. 552. The first defense was evidently intended as a plea of qualified privilege, and the second as a justification. Many of the same questions arise in each case, and the defense of justification may conveniently be considered first.

It is fundamental that a plea in justification must be as broad as the charge. Xavier v. Oliver, 80 App. Div. 292, 80 N. Y. Supp. 225; Young v. Fox, 26 App. Div. 261, 49 N. Y. Supp. 634. In determining what the charge is, the scope and object of the whole article must be considered, and such a construction put upon the language used as would naturally be given to it. More v. Bennett, 48 N. Y. 473. In the articles here complained of, many abusive terms are used; but, in the absence of innuendoes, only such statements as I consider libelous per se and refer unequivocally to the plaintiff will be considered.

1. The first libelous charge is one of "scoundrelism." It is true the plaintiff is not mentioned by name in connection with the use of this term, but reference to him is so plain and unmistakable that "he who runs may read." I do not see how one can read the letter without being irresistibly led to the conclusion that the word "scoundrelism" is directed towards the plaintiff and no one else. What the writer had in mind and what he was complaining of is evident from the first sentence in the letter:

"I had written a letter," he says, "to the Governor of the state to get redress for the scoundrelism hereinafter mentioned through the power of removal of city officials which he possesses, but on second thought I concluded to withhold it and first ask such redress through you."

What is the "scoundrelism hereinafter mentioned"? The refusal of the plaintiff as police commissioner to remove the photograph and record of the Duffy boy from the Rogues' Gallery. The plaintiff is the only one the writer is complaining of, and it is his removal that is referred to. The word "scoundrel" is libelous per se. 25 Cyc. 260, 261; Loveland v. Hosmer, 8 How. Prac. 215. There is no attempt to justify this charge in the defense pleaded, and if the

conclusion be correct, that the charge unmistakably refers to the plaintiff, then the defense is insufficient.

2. There is no justification of the charge that:

"The police commissioner is doing all he can to make it impossible for him to lead an honest life and make an honest living, and to force him instead to a life of crime."

This expressly refers to the plaintiff, is libelous per se, and proof of all the facts alleged in the defense would not justify a jury in finding that the charge was true. Indeed, the only charge against the plaintiff, so far as the Duffy boy is concerned, was his refusal to remove his photograph and measurements from the Rogues' Gallery and by reason thereof his arrests followed. I take it no one would seriously contend that proof of that fact would justify a finding that the plaintiff was doing all he could to make it impossible for Duffy to lead an honest life or make an honest living, but instead to lead a life of crime.

3. The charge that "incompetents, corruptionists, and sometimes buffoons who are put in rulership over" the men on the police force, and compel them against their wish to make false arrests, while it may refer to others, unquestionably refers to and includes the plaintiff, and because it may refer to others is none the less a libel upon him. The charge is that arrests "are being made"—the present— at which time the commissioner was at the head of the police department. Now, can it be said that this did not refer to him? He was the one, as already indicated, of whom the writer was complaining and whose removal from office was sought. If these epithets refer to and include him, as I think they do, then there is no attempt at justification, and this I understand the respondent concedes.

4. "It is an ordinary thing for the police commissioner to refuse to obey the decisions of the courts and compel the police force to disobey them." No attempt is made to justify the charge, certainly not in so far as it states that the police commissioner compels the police force to disobey the decisions of the courts. Nor do I think facts are stated which justify the charge that "the despotism and lawlessness of the police commissioner is shocking," or that "he is possessed of the most dangerous and destructive delusion that officials can entertain in a free government, namely, that he is under no legal restraint whatever, but may do as he wills, instead of only what the law permits, and that only in the manner it prescribes."

It is, however, urged by the respondent that, if the defense is a complete justification of any of the libelous charges, it is not demurrable. This is not a correct statement of the law, as I understand it. The justification must be as broad as the libel itself; that is, of all of the libelous charges made. The authorities referred to (Lanpher v. Clark, 149 N. Y. 472, 44 N. E. 182; Gressman v. Morning Journal Ass'n, 197 N. Y. 474, 90 N. E. 1131), and others, involved a question of proof and not pleading.

It seems to me, therefore, that the answer does not justify, at least so far as the charges above specified are concerned; and, if that

be true, then a complete defense is not set forth. The plaintiff's demurrer to the second defense pleaded should have been sustained.

The sufficiency of the first defense remains to be considered. The court at Special Term seems to have been of the opinion that the letter to the mayor was privileged as a confidential communication, written by a citizen having an interest in the matter discussed to a superior officer having the power of removal. But whatever privilege might otherwise have attached to the communication was destroyed when the defendant gave the same out for publication before it was received by the mayor. It is suggested by respondent's counsel that the publication is denied. It is denied in another part of the answer, but not in the defense under consideration. Moreover, there was, in any event, no such privilege attaching to the statement constituting the second cause of action. The real question presented by this defense is whether the articles were privileged as fair comments on the act of a public official. If the statements of facts were true, and the criticism fair and honest, without malice, the defense of privilege would be good. Hamilton v. Eno, 81 N. Y. 116; Mattice v. Wilcox, 147 N. Y. 624, 42 N. E. 270; Hoey v. N. Y. Times Co., 138 App. Div. 149, 122 N. Y. Supp. 978. But under the guise of privilege the character and motives of the official criticized may not be attacked. As was said in Hamilton v. Eno, supra:

"We are of the opinion that the official acts of a public functionary may be freely criticised and entire freedom of expression used in argument, sarcasm, and ridicule upon the act itself, and that then the occasion will excuse everything but actual malice and evil purpose in the critic. We are of the opinion that the occasion will not, of itself, excuse an aspersive attack upon the character and motives of the officer; that to be excused the critic must show the truth of what he has uttered of that kind."

Whether the bounds of fair criticism have been exceeded or not is a question of law for the court. Hoey v. N. Y. Times Co., supra. Instances have already been pointed out where the statements made were not fair comments on the acts of the plaintiff, but were defamatory of his character—i. e.: (1) Charging him with scoundrelism; (2) with being incompetent, corrupt, and a buffoon; (3) being a despot and lawless; (4) possessed of the most dangerous and destructive delusion that an official can entertain in a free government.

My conclusion, therefore, is that neither of the defenses demurred to is a complete defense to the cause of action set out in the complaint.

It follows that the interlocutory judgment appealed from should be reversed, with costs, and the demurrer sustained, with costs, with leave to the defendant to serve an amended answer, upon payment of costs in this court and in the court below.

INGRAHAM, P. J., and LAUGHLIN, J., concur.

MILLER, J. I dissent. The complaint is that:

"The alleged libelous articles were maliciously made, composed, and published concerning the plaintiff in his said office of police commissioner."

The first plea in defense states the occasion for writing said letters—i. e., the refusal of the plaintiff to take the photograph and measurements of the Duffy boy from the so-called "Rogues' Gallery"; the continued practice of the police to take photographs and make measurements of persons arrested, but not convicted, after Mr. Justice Burr had decided, in a proceeding to which the plaintiff was a party, that that practice was illegal; and the advice given by the plaintiff to one Kuhne, who had been convicted of contempt of court, to resist the court orders and to refuse to apologize and thereby purge himself of said contempt. The plea then avers that the matters of fact stated in the letter are true—

"and the opinions therein fair comment on the said acts of the plaintiff, and only such as to bring properly before the mayor the official misconduct of the plaintiff, and are without malice, and the said statement and the said letter were privileged."

Strictly speaking, the claim of qualified privilege only applies to the communication to the mayor, and the plea is in complete defense of all the publications. However, I think it is good as a complete defense. The subject of the articles—i. e., the official conduct of the plaintiff and of the police—was a matter of public concern. The press and any citizen had the right, fairly and in good faith, to comment upon it. If the statements of fact were true, the comments thereon fair, and the defendant's motives honest, the publications were not libels; and the plea demurred to presents those issues. Entire freedom of discussion of the public conduct of public men is permitted in this state. Fair and honest criticism is not defamation. The only limitation is that the occasion must not be used to gratify malice or to assail private character. Cooper v. Stone, 24 Wend. 434; Fry v. Bennett, 5 Sandf. 54; Reade v. Sweetzer, note 6 Abb. Prac. (N. S.) 9; Hamilton v. Eno, 81 N. Y. 116; Mattice v. Wilcox, 147 N. Y. 624, 42 N. E. 270; Triggs v. Sun Printing and Publishing Ass'n, 179 N. Y. 144, 71 N. E. 739, 66 L. R. A. 612, 103 Am. St. Rep. 841; Hoey v. N. Y. Times Co., 138 App. Div. 149, 122 N. Y. Supp. 978. Whether the deductions from a given state of facts are fairly drawn and honestly asserted must ordinarily be questions for the jury. Vide cases cited supra and Fay v. Harrington, 176 Mass. 270, 57 N. E. 369.

As I read the articles, there is not a word in them, unequivocally referring to the plaintiff, which imputes bad motives or evil designs to him or in any way reflects upon his moral character; and the complaint itself negatives the claim that the plaintiff's private character has been aspersed. Under the plea in question, the defendant will be permitted to give evidence of the truth of the specific statements of fact in the articles and the honesty of his purpose, and thereupon will be entitled to go to the jury on the question of the reasonableness and fairness of his inferences. The plea, therefore, cannot be bad. For a case sustaining almost precisely such a plea, see Kane v. Mulvains, 2 L. R. (C. L. S.) 402.

It is to be noted that the articles are pleaded as a whole, without innuendo. Considered as a whole, they are an attack upon the

practice of the police in measuring and photographing persons arrested, but not convicted, and upon the plaintiff's official conduct in approving and continuing that practice in the face of a decision of a justice of the Supreme Court, and in refusing to take the photograph of the boy, Duffy, from the so-called "Rogues' Gallery." The plea in justification alleges that the statements, matters, and things contained in said alleged libels are true, and supports that by specific averments of every fact therein stated, and of many not stated, to wit, that in November, 1907, the police, under the command of the plaintiff, seized, photographed, and measured one Frank Jenkins, who was at large on bail; that, after Mr. Justice Burr had decided, in a case in which the plaintiff was a party, that the police have no authority to measure and photograph persons, and put their pictures in the "Rogues' Gallery," unless on conviction of crime and sentence to prison, the police, under the command of the plaintiff, with his knowledge, and in many cases under his personal advice and direction, "continued to photograph, and to strip, measure and index as felons, many hundreds of persons, not convicted and sentenced to prison"; that the plaintiff counseled and advised the officers under him to disregard said decision, and advised one Kuhne to defy the judgment of the Supreme Court, convicting him of contempt of court, and to refuse to apologize, and agreed to and did pay his fine, gave him a leave of absence while he was serving a term in jail, and promised to reward him by a promotion; that, with full knowledge of the decisions of the courts on the subject and the records, the plaintiff refused to remove the photograph and measurements of the Duffy boy, and stated openly and publicly that the treatment of him, as set forth in the alleged libelous articles and in the plea, was justified; that, with full knowledge of, and in violation of, an injunction, granted about February 6, 1906, the plaintiff and his subordinates, acting under his direction and control, without a warrant or other legal process, entered certain premises named, and annoyed, harassed, and oppressed the occupants thereof.

It cannot be doubted that every statement of fact in the alleged libels is met by the plea. The characterizations and the general observations remain to be considered. The ones pointed out by the learned counsel for the appellant may be divided into two classes: (a) Those of doubtful application; (b) those unequivocally referring to the plaintiff.

(a) Those of doubtful application are the following: "Scoundrelism, hereinafter mentioned;" "outrageous violations of our laws and system of free government;" "criminal official wrongdoing and oppression;" and the paragraph beginning "Many thousands of false arrests are being made here annually." I think that all but the last refer to the treatment of the Duffy boy by the police, which is narrated. At any rate, a jury would be justified in so finding. The plaintiff is charged with having refused to direct the removal of the boy's photograph, and with thereby allowing such treatment to continue. In effect, the defendant said that he had applied to the plaintiff on behalf of the boy for relief from what is characterized as

"scoundrelism," "outrageous violation of our laws and system of free government," "criminal official wrongdoing and oppression on the part of the police," and that, having met with a refusal, he asked the mayor for relief, intimating that he might ultimately go to the Governor. · The "many thousands of false arrests" are not specifically, or even inferentially, charged as having been caused by the plaintiff, and the epithets "incompetents, corruptionists, and buffoons" do not necessarily refer to him. Of course, if they do, there is no attempt at justification. But the plural is used—a class referred to, which may include any number of the plaintiff's predecessors and any number of subordinate officers, who are, or have been put, in rulership over the men on the force, and may or may not include the plaintiff. Certainly we cannot say as matter of law whether the ordinary reader would understand that all or any particular one of those terms referred to the plaintiff. The expression "men on the police force," as commonly understood, does not include all the men in the department under the commissioner. An interesting nisi prius case, which happens to be at hand, may be cited for the proposition that the application of those words is for the jury. Seymour v. Butterworth, 3 F. & F. 372.

(b) The statement, "The Police Commissioner is doing all he can to make it impossible for him to lead an honest life and make an honest living, and to force him instead to a life of crime," is not to be construed apart from its context. It is merely the writer's conclusion as to the effect of the plaintiff's refusal to remove the boy's photograph, and of the continued police persecution in consequence. I do not now think of any course of conduct which would be more likely to ruin a lad of 19 than that detailed in the letter and in the plea demurred to.

The reference to the plaintiff as the "offender" relates to the seizure in November, 1907, of persons at large under bail, and is specifically met by the plea. The only other references to the plaintiff, requiring notice, are the following:

"But it is an ordinary thing for the Police Commissioner to refuse to obey the decisions of the courts and compel the police force to disobey them. Many instances can be cited."

"He is possessed of the most dangerous and destructive delusion that officials can entertain in a free government, namely, that he is under no legal restraint whatever, but may do as he wills, instead of only what the law permits, and that only in the manner it prescribes."

"The despotism and lawlessness of the Police Commissioner is shocking to every American who knows what free government means and what it cost in property and blood of our ancestors to acquire it."

At least four specific instances are averred in justification of the first charge, last above quoted. Moreover, it was not necessary to specify every one of the "many hundreds" of cases in which men were photographed in disregard of Mr. Justice Burr's decision. The The paragraph next quoted does not import a charge of insanity, as is said, nor does it reflect upon the plaintiff's private character. It is the concluding observation of the writer upon the plaintiff's official acts, previously narrated. The words "despotism and law-

lessness" in the last quotation do not import a charge of general lawlessness, but refer to the specific acts under discussion. The defendant defined what he meant by "despotism," and obviously the word "lawlessness" was used much in the same sense.

The plaintiff has limited his complaint to the publications as a whole, and therefore cannot require the defendant to plead to his construction of isolated words and phrases. The charge consists of statements of fact and of comments thereon. The plea fairly meets all of said statements, and avers other facts in further justification of the comments. It will be for the jury to determine the meaning and application of the comments, and to say whether they were justified. We cannot rule that the plea is not as broad as the charge, simply because we may think some of the defendant's animadversions too severe, though I am far from suggesting that the facts averred did not justify vigorous comment, or that they do not justify the charge, even upon the plaintiff's own construction, except as to the words "incompetents, corruptionists, and buffoons."

It follows that the pleas in defense are not open to attack by demurrer; indeed, I think they were scientifically drawn to meet the complaint, and therefore vote to affirm the interlocutory judgment.

DOWLING, J., concurs.