(86 Misc. Rep. 217)

WORLD'S DISPENSARY MEDICAL ASS'N v. COLLIER et al.

(Supreme Court, Special Term, Erie County. June 18, 1914.)

1. LIBEL AND SLANDER (§ 94*)—ANSWER—JUSTIFICATION—"QUACK."

In actions by a medical association and physicians associated together as such association for libel in charging that such physicians were quacks dealing in a variety of nostrums, in which the complaint contained an innuendo that it was meant thereby that they were not duly qualified, licensed, and registered to practice medicine and had not the knowledge and training necessary to practice medicine, allegations of the answers, that such physicians were quacks, that they were engaged in advertising, vending, and dealing in a variety of nostrums or patent or quack medicines publicly recommended by such association, and particularly medicines the formulas and processes of compounding of which were kept secret, and alleged medical compounds positively recommended as cures for various ills and generally known as "cure-alls," that they were boastful pretenders, publicly and offensively exploiting for sale alleged "cure-alls," and making extravagant and false claims for the products of the association, advertising with fraudulent boasts, and engaged in the unprofessional, undignified, and unethical alleged medical treatment of patients by mail, that they were unlawfully engaged in the practice of medicine as a corporation and in making unfounded claims with respect to the healing properties of such compounds, tending to mislead persons and thereby to induce the purchase and consumption of such medicines regardless of the physical condition of the purchaser or the fitness of the compound for his ailment or supposed ailment, and, in spite of the fact that such compounds were destitute of curative powers for the diseases for which they were recommended and sold and that serious results would follow their consumption, and that they inordinately boasted of their ability to do what other people might or might not be able to accomplish and advertised and exploited such products as possessing greater therapeutic efficacy than they really did, and vaunted themselves and their alleged medical skill as superior to the medical profession at large and resorted to vulgar devices to promote the sale of such products, were not irrelevant since, while the word "quack" means, as alleged in the innuendo,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

an unqualified, incompetent, and unlicensed physician, it also means a person engaged in the practices alleged in the answers.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 219–225; Dec. Dig. § 94.*

For other definitions, see Words and Phrases, vol. 7, p. 5873.]

2. WORDS AND PHRASES—"NOSTRUM."

A "nostrum" is a quack, patent, or proprietary medicine recommended by its proprietor, or one the ingredients of which are kept secret for the purpose of restricting the profits of sale to the inventor or proprietor (citing Words and Phrases, vol. 5, p. 4831).

3. LIBEL AND SLANDER (§ 9*)—LIBELOUS WORDS.

It is libelous to charge a member of the medical profession with being a quack, whether that term is used to mean an unqualified, unlicensed, and incompetent physician, or a person dealing in nostrums manufactured by him and making false and fraudulent claims concerning the efficacy and curative powers thereof or guilty of other unethical or unprofessional acts.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 80–90; Dec. Dig. § 9.*]

4. LIBEL AND SLANDER (§ 123*)—QUESTIONS FOR JURY—MEANING OF LANGUAGE.

Where the language of an alleged libelous publication is capable of two meanings, it is for the jury to determine in which sense the words were intended and understood.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.*]

5. LIBEL AND SLANDER (§ 94*)—PLEADING—JUSTIFICATION.

The word "quack" being capable of more than one meaning and being libelous whichever meaning is intended, defendants in an action for libel could allege facts to show that plaintiffs were quacks in one meaning of that word, though the innuendo charged a different meaning, since, if the innuendo failed, plaintiffs might still recover on the other libelous meaning.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 219–225; Dec. Dig. § 94.*]

6. PLEADING (§ 362*)—MOTIONS—STRIKING OUT MATTER.

Motions to strike out parts of a pleading as irrelevant are not favored, and, where there is a semblance of a cause of action or defense set up, the sufficiency of the pleading will not be determined on such a motion, but will be left to the trial court to pass on when the evidence is offered.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1147–1155; Dec. Dig. § 362.*]

Four actions by the World's Dispensary Medical Association, Lee H. Smith, John M. Garrett, and Benjamin W. Cornwell, respectively, against Robert J. Collier and others. On motions by plaintiffs to strike from the answers of defendants certain parts thereof as irrelevant and redundant. Motions denied.

Joseph H. Morey, of Buffalo, for the motion.
James W. Osborne, of New York City, opposed.

WHEELER, J. [1] The above-entitled actions are for an alleged libel. On the 20th day of January, 1912, there was published in Collier's Weekly Journal an article written by the defendant Adams, which it is claimed constituted a libel on each of the plaintiffs above

named. Mr. Collier, as proprietor, Mr. Hapgood, as managing editor, and Mr. Adams, as the writer, are made parties defendant. The entire article is long, consisting of several columns of matter headed, "Fraud Medicines Own Up," and, among other things, contains the following statement:

"Under the high-sounding title of the World's Dispensary Medical Association, Dr. R. V. Pierce and his associate quacks deal in a variety of nostrums."

The plaintiffs in their complaint set forth this statement, and in connection therewith allege:

"(Meaning thereby that this plaintiff was an association of quack doctors, to wit, persons who were not duly qualified, licensed and registered to practice medicine, and who had not the knowledge and training necessary to practice medicine; that the plaintiff's medical and surgical work in said hospital and sanitarium was being conducted by such quack doctors for and under the name and authority of plaintiff; and that this plaintiff was employing as physicians in prescribing for and treating patients in its said hospital and sanitarium, persons who were not qualified and licensed to practice medicine, and who had not the knowledge and training necessary to practice medicine, and no others); intending thereby to injure the plaintiff's credit, reputation and good name in its said business, and to expose plaintiff to public hatred, contempt and obloquy in and about its said business."

The defendants in their answers, and by way of justification of the matter complained of, allege:

"(8) That all the allegations contained in the alleged libel were and are true.

"(9) That it is true that the said Dr. R. V. Pierce was president of the plaintiff corporation, and certain other persons were associated with the said Pierce in the employ of plaintiff under the corporate title of the World's Dispensary Medical Association, and that they are and were quacks prior to and at the time of the publication of the alleged libel and at all the times mentioned in the amended complaint, in that they were engaged in advertising, vending, and dealing in a variety of nostrums or so-called 'patent medicines' or 'quack medicines' and medicines publicly recommended by plaintiff, particularly medicines the formulas and processes of compounding of which were kept secret by plaintiff, and especially so-called alleged medical compounds, positively recommended as cures for various ills of mankind and generally known as 'cure-alls'; and further in that the said World's Dispensary Medical Association, Dr. R. V. Pierce, and those associated with him, in the employ of the plaintiff, who were connected with the advertising and vending and dealing in the particular nostrums or so-called proprietary medicines, hereinafter mentioned, were boastful pretenders, publicly, offensively exploiting for sale alleged 'cure-alls,' and making extravagant and false claims for the products of plaintiff, advertising with fraudulent boasts, and engaged in the unprofessional, undignified, and unethical alleged medical treatment of patients by mail, without personal observation or examination of said patients; and further in that they were unlawfully engaged in the practice of medicine as a corporation and not in their individual professional capacities, and were engaged in making unfounded claims with respect to the healing properties of such compounds, tending to mislead persons and thereby to induce the purchase and consumption of such patent medicines, regardless of the physical condition of the individual purchasing the same or of the fitness of the compound for the ailment or supposed ailment of the purchaser thereof, and in spite of the fact that said compounds are destitute of curative powers for the diseases for which they are recommended and sold and that serious results would follow their consumption in the manner recommended by plaintiff, as will hereinafter be more particularly described; and further in that they were vendors of nostrums and inordinately boasted of

their ability to do what other people may or may not be able to accomplish, and in that they advertised and exploited the said products of the World's Dispensary Medical Association as possessing greater therapeutic efficacy than they really do; and further in that the said Dr. R. V. Pierce vaunted himself and his alleged medical skill as above and superior to the medical profession at large, and in that he and his said associates resorted to vulgar devices to promote the sale of the said products of the World's Dispensary Medical Association and to obtain patrons of their system of alleged medical treatment by mail; and further in that they were quacks by reason of other facts and circumstances hereinafter set forth in this answer."

The answers then proceed at great length, but in separate paragraphs, to specify alleged facts and specific acts and instances by which it is claimed the plaintiffs were guilty of the conduct and practices alleged generally in the portion of the answer quoted above.

The plaintiffs contend that the matter set forth constitutes no justification of the charge made, and therefore move to strike out the allegations made, as irrelevant to the issue tendered.

Whether the allegations of the answers are to be deemed relevant or irrelevant turns on the meaning of the word "quacks," as used in the published article.

The plaintiffs contend, in substance, that the word "quack," as so used, was intended to characterize the plaintiffs as unqualified, incompetent, and unlicensed physicians.

The defendants disclaim any purpose or intention to make such a charge, and allege, in substance, that the plaintiffs were "quacks" in the sense that they dealt in a variety of nostrums manufactured by them, and for years made false and fraudulent claims concerning the efficacy and curative powers of these nostrums or patent medicines, and were guilty of other unethical and unprofessional acts, and that they were "quacks" by reason thereof, and that the word was so used, employed, and understood in the article which is made the subject-matter of these actions.

There can be no question that the words "quack" and "quackery" have been variously defined and used. While undoubtedly the word "quack" has the meaning claimed for it by the plaintiffs, such is not the sole and only meaning of the word. We need only quote the definition of the words given in various standard works and publications:

Lippincott's New Medical Dictionary (2d Ed.) 1911, defines the word "quack" as follows:

"One who brags inordinately of his ability to do what other people may or may not be able to accomplish, but which does not necessarily imply want of knowledge or skill. A medical charlatan; a quack solver. Q. medicine, a secret medicine exploited as expressing greater therapeutic efficacy than it really does. Quackery. Mean or bad acts in physic, comprehending not only the absurd impostures of ignorant pretenders, but also unbecoming acts of professional men themselves."

Foster's Encyclopedic Medical Dictionary, 1894, defines the word as follows:

"Quack, see charlatan."
"Charlatan, N. (Shar' la-ar said to be from it. Ciaralari, to prattle, prate; according to some, a contraction of Fr., Char de Latan, Latan's Wagon, a vehicle in which Latan, a Paris Quack, was accustomed to visit patients, phy-

sicians before his time having visited the sick only on foot, so that it was commonly exclaimed, when Latan was seen approaching, 'Voila le char de Latan.' Fr., c. Ger., c., Scharletan, Quacksalber. It., ciarlatano. Sp. Charlatan). One, either practices medicine or pharmacy illegally, or being a legal qualified practitioner resorts to vulgar devices to obtain practice, as by advertisements, public exhibitions, etc."

Webster's New International Dictionary defines quack as follows:

"To make vain and loud pretensions, esp. of medical ability; to boast, to vaunt loud. A boastful pretender to medical skill. To make extravagant claims for as a cure-all; to advertise with fraudulent boasts."

The Practitioner's Medical Dictionary, by George M. Gould, A. M., M. D. (2d Ed.) 1910, recognizes the two meanings of the word. Its definition is as follows:

"Quack; (kwak) a pretender to medical skill; a vendor of nostrums; a medical charlatan."

And defines "charlatan" as follows:

"A quack; a pretender to medical skill; an advertising doctor."

[2] In connection with the word "quack" as employed by defendants, it is important to ascertain the meaning of the word "nostrum." Webster's New International Dictionary defines "nostrum" as:

"A medicine recommended by its preparer; esp., a medicine the ingredients of which are kept secret by the inventor or proprietor; a patent medicine; a quack medicine."

Words and Phrases, vol. 5, p. 4831, says:

"A nostrum is defined to be a medicine the ingredients of which are kept secret for the purpose of restricting the profits of sale to the inventor or proprietor—a quack medicine"—citing Commonwealth v. Fuller, 2 Walk. (Pa.) 550–551.

The American Illustrated Medical Dictionary defines the word "nostrum" as:

"A quack, patent, or secret remedy."

Lippincott's New Medical Dictionary defines "nostrum" as:

"Any quack or patent medicine. See proprietary preparations; secret remedy."

The American Illustrated Medical Dictionary defines "nostrum" as:

"A quack, patent or secret remedy."

The Oxford Dictionary cites many illustrations in literature of the use of the words "quack" and "quack salvers" by eminent writers, and in each instance they are used in connection with drugs and medicines. It cites Defoe in 1722, as follows:

"Running after quacks and mountebanks * * * for medicines and remedies."

It quotes Washington Irving's phrase:

"He who has once been under the hands of a quack is forever after prone to dabble in drugs."

In 1605, B. Jonson wrote:

"They are quack salvers, fellows that live by scenting oils and drugs."

In Kohler Mfg. Co. v. Beeshore, 59 Fed. 572, page 574, 8 C. C. A. 215, 217, the court defines "quack medicines" as follows:

"It has been more than once held in this circuit that courts of equity will not intervene by injunction in disputes between the owners of quack medicines, meaning thereby, remedies or specifics whose composition is kept secret, and which are sold to be used by the purchasers without the advice of regular or licensed physicians. Fowle v. Spear (Nov. Term, 1847) 7 Pa. Law J. 176; Heath v. Wright, 3 Wall. Jr. 141 [Fed. Cas. No. 6,310]. A similar view has prevailed in several state courts. Wolfe v. Burke, 56 N. Y. 115; Smith v. Woodruff, 48 Barb. (N. Y.) 438; Laird v. Wilder, 9 Bush (Ky.) 132, 15 Am. Rep. 707. In the present case, the so-called 'trade-mark,' 'One Night Cough Cure,' asserts a manifest falsehood or physiological impossibility. A cough or cold so far seated as to require medical treatment cannot be cured in a single night, and a pretense to the contrary is obviously an imposition on the ignorant. If it be said that the court cannot take notice of such a state of facts, and that there is no evidence from which the court can infer it, we can, at all events, take notice of the plaintiff's evidence, whereby it is shown that the trade-mark in question was not selected because experience had shown that the nostrum availed to cure coughs and cold within the period of a single night, but because a similar trade-mark or designation, 'One Night Corn Cure,' had proved to be a popular and taking one."

In Smith v. Woodruff, 48 Barb. (N. Y.) 438, the court, by Leonard, P. J., in considering the question of whether or not an injunction would lie by one patent medicine proprietor against another, for imitating his labels, says, at page 440:

"The only plausible defense arises from the allegation of the defendant, that the plaintiffs are as wicked as he is, in that they attempted to impose upon and defraud the public, while he attempts only to defraud the plaintiffs.

"The justice and morality of this defense is not very high, in the present instance, but this rule of law or equity has been recognized in several cases, and must be followed if the case is brought within its application. It is a defense that ought to be suggested by the court in some cases, and probably would be in all cases where the imposing is flagrant. For instance, where a quack compounds noxious and dangerous drugs, hurtful to the human constitution, and advertises them as a safe and sure remedy for disease; or where some charlatan avails himself of the prejudice, superstition, or ignorance of some portion of the public, to palm off a worthless article, even when not injurious—the case falls beneath the dignity of a court of justice to lend its aid for the redress of such a party, who has been interfered with by the imitations of another quack or charlatan."

In the English case of Hunter v. Sharpe, 4 F. & F. 983 to 1007, Justice Cockburn, in his instructions to the jury in a libel action brought by a regular licensed physician charged with practices very similar to those alleged against the plaintiffs in these actions, in substance adopted the definition of the words "quack" and "quackery" contended for by defendants here.

In the case of Dakhyl v. Labouchere, decided by the House of Lords, in 1907, and reported in K. B., 1908, vol. 2, p. 325, Lord Loveburn said:

"The pith of the libel is that the defendant wrote of plaintiff as a 'quack of the rankest species,' in connection with his services on the staff of the Drouet Institute. The defendant denounced the Drouet Institute on what he claimed to be public grounds, as an organized system for dishonestly ob-

taining money from persons suffering from deafness in the hope of a cure. The defendant pleaded that his accusation against the plaintiff was true, and also that it was protected as a fair comment upon a matter of public interest. The jury found a verdict for plaintiff of £1,000. I rest my opinion that the verdict cannot stand upon two grounds. In the first place the defendant was entitled to have the jury's decision on his plea of justification, and whether the words used were true in the plain meaning which the jury might attach to them. Unfortunately the learned judge told the jury more than once that the term 'quack' meant a pretender to skill which the pretender did not possess. If that were a sound direction, and really it was put as a direction, there could not be a verdict on this point against the plaintiff, for admittedly he possessed skill; but there are other meanings of the word 'quack,' such as a person who, however skilled, lends himself to medical imposture. The jury were the persons to affix the true meaning to the words and to say whether or not it fitted the plaintiff, but they had not a chance if they followed the judge's direction. In the second place, the defendant was, in my opinion, entitled to have the jury's decision as to the plea of fair comment, whether or not, in all the circumstances proved, the libel went beyond a fair comment on the plaintiff and on the system of medical enterprises with which he associated himself, as a matter of public interest treated by the defendant honestly and without malice; .* * * but the learned judge put aside that defense and told the jury that, unless a justification was proved, they were bound to find a verdict for the plaintiff, and that, unless justified, the libel is not fair comment and cannot come within the region of fair comment."

It is manifest, therefore, that the meaning of the word "quack" is not confined to that alleged in the innuendo charged in the complaint but also has the meaning set forth in the defendants' answers.

[3] Nevertheless, to charge a member of the medical profession with being a "quack," whether the term be used in the sense alleged by the plaintiff, or in the sense claimed by the defendants, is libelous. It will be necessary, therefore, for the defendants to establish to the satisfaction of the court and jury, upon the trial of these actions, in order to defeat a recovery, that the word used in the article complained of was in fact used and understood in the sense alleged in their answers, and to that end it was necessary, in their pleading, by appropriate allegations, to justify the charge made.

[4] It is the undoubted law that, where the language of a publication is capable of two meanings, it is for the jury to determine in which sense the words were intended and understood. Hayes v. Ball, 72 N. Y. 418; Sanderson v. Caldwell, 45 N. Y. 398, 6 Am. Rep. 105; Morrison v. Smith, 177 N. Y. 366, 69 N. E. 725; Woodruff v. Bradstreet, 116 N. Y. 217, 22 N. E. 354, 5 L. R. A. 555; D'Andrea v. N. Y. Press, 61 App. Div. 605, 70 N. Y. Supp. 759; Young v. Fox, 26 App. Div. 261, 49 N. Y. Supp. 634; Garby v. Bennett, 40 App. Div. 163, 57 N. Y. Supp. 853, affirmed 166 N. Y. 392, 59 N. E. 1117; Gallagher v. Bryant, 44 App. Div. 527, 60 N. Y. Supp. 844, affirmed 162 N. Y. 662, 57 N. E. 1110.

[5] It is contended, however, that the plaintiffs have the right to stand upon the innuendo set forth in their complaints, to the exclusion of any and all other meanings of the word "quack."

We have already pointed out that the term complained of is libelous, if untrue, whichever of the two meanings was intended. If the innuendo charged by the plaintiffs' fails, the plaintiffs would still have the right to recover, unless the defendants are able to justify on the

other meaning of the word employed.   Morrison v. Smith, 177 N. Y. 366, 69 N. E. 725.

The headnote of this case reads:

"When the plaintiff in an action of libel has, by innuendo, put a meaning upon the alleged libelous publication which is not supported by the language, or by proof, the court may, nevertheless, submit the case to the jury if the article is libelous per se."

The statement of the headnote is sustained by the opinion in full. See, also, the opinion of Mr. Justice Laughlin in the Appellate Division, 83 App. Div. 206, 82 N. Y. Supp. 166.   Also, Hoey v. N. Y. Times Co., 138 App. Div. 149, 122 N. Y. Supp. 978;   Morse v. Press Pub. Co., 49 App. Div. 375, 378, 379, 63 N. Y. Supp. 423.

It thus became proper and necessary for defendants in their answers not only to deny the allegations of the complaint set forth in the innuendo, but by proper allegations to justify the use of the word "quack" in the sense claimed to have been used by them, and to that end set forth the entire article as published, tending to support their contention as to the meaning intended and conveyed when read in connection with the entire article.

The allegations of the answer are so voluminous that it is impossible for the court at this time to discuss in this memorandum in detail the various matters to which the court's attention has been called in the elaborate and very able briefs of counsel for each side.

We are of the opinion, however, that the plaintiffs' motions should be denied.

[6] It is, however, pertinent to add that motions to strike out parts of pleadings as irrelevant are not favored.   Where there is a semblance of a cause of action or of a defense set up, its sufficiency will not be determined on a motion to strike out as redundant or irrelevant, but it will be left to the trial court to pass on such questions when the evidence is offered.   Walter v. Fowler, 85 N. Y. 621;   Bradner v. Faulkner, 93 N. Y. 515;   Dinkelspiel v. N. Y. Evening Journal, 91 App. Div. 96, 86 N. Y. Supp. 375;   John Church Co. v. Parkinson, 86 App. Div. 163, 83 N. Y. Supp. 175;   Vogt v. Vogt, 86 App. Div. 437, 83 N. Y. Supp. 677.

The motions are therefore denied, with $10 costs in one case.

So ordered.