JOHN B. BURNHAM, Plaintiff, *v.* WILLIAM T. HORNADAY, Defendant.

Supreme Court, Essex County, August 16, 1927.

Libel and slander — pleadings — complaint — article charged plaintiff, chairman of Federal advisory board under Migratory Bird Treaty Act, with using influence to prevent restriction of number of birds taken and open season — article was libelous per se — plaintiff not bound by innuendo — complaint sufficient — answer — defenses of fair comment and qualified privilege must be separately pleaded — article was neither fair comment nor was it qualifiedly privileged — plea of justification insufficient — matters unknown to defendant at time of publication cannot be pleaded in mitigation — repetition in last defense is redundant and prejudicial.

This is an action for libel. The complaint alleges that the defendant maliciously wrote and prepared a statement which he furnished the newspapers and caused to be published, which statement is false and defamatory. The complaint also sets out the alleged libelous statement. The statement in question charges the plaintiff, who is chairman of the Federal advisory board appointed under the Federal Migratory Bird Treaty Act, and who is also president of the American Game Protective and Propagation Association, with using his influence with the Secretary of Agriculture to prevent a restriction of the number of birds that might be killed in any one day, and with preventing a restriction on the closed season for shooting migratory birds. The statement is libelous *per se* in that it tends to degrade the plaintiff and implies that he acted hypocritically and corruptly in a position of public trust which he held as chairman of the advisory board.

The article being libelous *per se*, the plaintiff is not confined to the innuendo in his pleading, but may fall back on the natural and obvious meaning of the words. An innuendo may be treated as surplusage when it is used in connection with words that are unequivocal and libelous *per se.*

The article being libelous *per se*, it was not necessary for the plaintiff to allege special damages, and the complaint, therefore, states a good cause of action.

The defendant cannot join the plea of fair and justifiable comment on a matter of public interest with a plea of qualified privilege. Each defense must be separately stated and numbered.

The statements by the defendant, who was a member of the advisory board, were not privileged, nor were the statements a fair comment on a matter of public interest.

The plea of justification is insufficient, since it is not so broad as the charge, in that it fails to substantiate the imputations of hypocrisy and corruption which the article conveys.

The plea in mitigation of damages is insufficient, since it is nowhere alleged in that defense that the matters therein alleged were known to the defendant when he published the statement. Unless such knowledge is alleged, evidence of the facts cannot be received in mitigation.

The repetition in the final defense of the facts which appeared in each of the preceding defenses is redundant and prejudicial and should be stricken out. In a libel action where the real issues relate to matters of personal integrity, the retention in the pleadings of evidentiary, redundant and irrelevant allegations would necessarily prejudice a fair trial of the cause.

MOTION to strike out certain alleged defenses in action for libel.

O. Byron Brewster [Walter H. Pollak and John E. Joyce of counsel], for the plaintiff.

Davies, Auerbach & Cornell [Nicholas F. Lenssen, Martin A. Schenck and Murray C. Bernays of counsel], for the defendant.

HEFFERNAN, J. This is an action for libel. The pleadings disclose that plaintiff and defendant are interested in the subject of game conservation in the United States. As to what degree of conservation is desirable, what methods should be employed — in particular what limits should be imposed by Federal regulation upon game bags and the length of the open seasons — they differ radically.

By the Migratory Bird Treaty Act of July 3, 1918 (40 U. S. Stat. at Large, chap. 128), the Department of Agriculture was given authority to enforce the provisions of the Migratory Bird Treaty relating to the protection of birds migrating between Canada and the United States. In accordance with the provisions of this act an advisory board of twenty-one members was appointed by the Secretary of Agriculture. To this board, together with the Chief of the Biological Survey, is intrusted the formulation of rules and regulations concerning the hunting, shooting and capturing of migratory birds and these regulations when accepted by the Secretary of Agriculture and approved by the President of the United States, have the force of law under this act.

Plaintiff is and has been, from the time of its formation, the chairman of this advisory board, and defendant, until 1926, was a member of it.

Plaintiff is also the president of the American Game Protective and Propagation Association, a membership corporation organized under the New York law.

In 1923 at a meeting of the advisory board defendant introduced a proposed resolution that the board recommend to the Secretary of Agriculture a fifty per cent reduction of game bag limits and open seasons on certain migratory game birds. Plaintiff opposed this measure. The board did not adopt the resolution and defendant, up to the time of the publication complained of, had not succeeded in getting these changes introduced into the Federal Game Regulations.

The complaint charges that on or about August 11, 1925, the defendant maliciously composed and caused to be published in the New York *Times* in its issue of August 12, 1925, the following statement of and concerning plaintiff which he alleges is defamatory:

" I (meaning defendant) am discouraged, gloomy and pessimistic because the birds are on the ragged edge of oblivion. I am trying to adjust my mind to a result that seems quite inevitable. The bird-defenders hold few good cards and all the high trumps seem to be held by the bird. destroyers. For years I have noted the awful annual increase in bird slaughter and for years I have dreaded the arrival of the day when the small circle of men who control game protection matters in Washington would decide that no more reductions should be made in the killing privileges of sportsmen and game hogs.

" That day has arrived. First, the gunmakers' American Game Protection Association and then the United States Department of Agriculture very firmly decided that the Federal bag limits on migratory game birds should not be reduced by the annual Federal regulation. John B. Burnham, President of the gunmakers' association, opened the attack on the reform measure. He officially is the chief adviser of the Department of Agriculture on the migratory bird laws.

" The Federal Government is. in close agreement with the paid agents of the big corporations who make and sell guns and ammunition. * * * It is reported that John B. Burnham's influence in the Biological Survey is paramount, and the records point that way.

" The split between the gun crowd and the field has come about over the killing privileges of the six or seven million sportsmen who annually hunt game in the United States. The gun sellers and the Government flatly refuse to agree to make the substantial reductions in hunting privileges that have been widely demanded in the interest of the preservation of game and sport on a permanent basis. In winter the ducks and geese mass up in nine States, and the sportsmen and duck hunters who shoot in those States refuse to budge an inch from twenty-five ducks and eight geese per day. Thus far they seem to completely control the Department of Agriculture.

" INCOME FROM GUN MAKERS

" What is the source of the income of that American Game Protective Association?

" Its source is the annual profits of the Remington Arms Company, the Winchester and Savage Arms Companies and we know

14

not how many more gun, cartridge and powder companies. It is believed that a few small sums come from other sources. At the beginning in 1912, and for several years thereafter, the annual contribution of the manufacturers of game-killing appliances was $25,000. But Mr. Burnham's association seems to carefully refrain from publishing any public reports of receipts or disbursements. Nor has it ever, so far as I have seen or heard, published a list of its sustainers. Why is that? It seems to be the only conservation organization which persistently hides all information of that kind.

" I regard Mr. Burnham's influence over Dr. E. W. Nelson and other high officers of the Biological Survey on game-shooting privileges as completely paramount. I believe that that association's influence is to blame for the fact that now the Biological Survey and the Secretary of Agriculture have flatly refused all appeals to reduce the bag limits and open seasons on migratory game, and have passed the buck to the States to do as they please about it. Ever since 1918 the Secretary of Agriculture has held idle in his hands the power specially placed there by Congress to reduce the nation's bag limits and open seasons on migratory game, to offset the awful annual increase in hunters, guns and killing. The only bag-limit change any Secretary has made during the last eight years (1918 to 1925) has been to raise the bag limit on the poor little sora rail from 25 per day to 50 per day! Can you beat that record for sheer evasion of duty and lost opportunities? "

The complaint also alleges an innuendo in which plaintiff attributes to the words used the fixed and definite meaning which he thinks they ought to bear.

The answer, consisting of forty-two typewritten pages, after admitting the composition and publication of the article, pleads four affirmative defenses. The first ten paragraphs rehearse all the services that defendant has rendered without remuneration to the cause of conservation in the United States. In paragraphs 11–65 inclusive defendant sets up as a complete defense, qualified privilege; fair comment on a public question and justifiable reply to attacks made by plaintiff on defendant. The matters alleged in paragraphs 22–64 of the first defense are realleged in the second defense as complete justification. The allegations of the second defense are realleged as partial defenses in mitigation of damages in the third and fourth defenses. There are also included in these defenses allegations to the effect that defendant, by reason of certain facts, was induced to believe the truth of the charge, together with statements of events occurring subsequently to the publication.

The plaintiff has moved to strike out the defenses of qualified

privilege, fair comment and justification as insufficient in law and adds separately stated motions to strike out practically every other allegation in the answer as redundant, irrelevant and prejudicial.

The defendant asserts that the complaint fails to state a cause of action and he asks for its dismissal. Plaintiff's motion to strike out affirmative defenses searches the record and necessarily involves the sufficiency of the complaint. (*Baxter* v. *McDonnell*, 154 N. Y. 432; 155 id. 83; *Title Guarantee & Trust Co.* v. *City of New York*, 205 id. 496; *Manson* v. *Curtis*, 223 id. 313.) The same rule is applicable where insufficiency of affirmative defenses is tested by motion rather than under the old practice by demurrer. (*Small* v. *Sullivan*, 245 N. Y. 343.)

The defendant's criticism of the complaint is that the allegations of falsity are indefinite and insufficient; that the article is not libelous *per se* and that the pleading contains no averment of special damage. The complaint in the tenth paragraph alleges that " defendant maliciously composed, gave and furnished to certain newspapers " the statement in question and that it " contained the following false and defamatory matter of and concerning this plaintiff." This language is followed by the publication. It is difficult to understand how the language could be more specific. The case of *Rein* v. *Sun Printing & Publishing Association* (196 App. Div. 873) upon which the defendant relies is distinguishable. Unlike the case at bar, in the *Rein* case the publication complained of was introduced without any allegation of falsity. That the absence of such an allegation was the basis for holding the complaint defective is evident from the following extract from the opinion of Mr. Justice DOWLING: " I believe that where there is no allegation that the whole article is false and untrue, but specific portions are picked out as being false, the denial of the truth of such specified statements should be plain and explicit."

The complaint contains only general allegations of damage and consequently it must be determined whether or not the publication is libelous *per se*. In the absence of a proper allegation of special damages, as in this case, the article complained of must be libelous *per se* in order to be the basis of a cause of action. When the words are not *prima facie* actionable the complaint must not only contain an averment of special damages but it must set forth precisely in what way such damages resulted from the publication. (*O'Connell* v. *Press Publishing Co.*, 214 N. Y. 352; *Reporters Association* v. *Sun Printing & Publishing Association*, 186 id. 437; *Crashley* v. *Press Publishing Company*, 179 id. 27.) When the article is not libelous on its face but becomes so only by reference to extrinsic facts, such facts must be alleged in a traversable form.

(*Corr* v. *Sun Printing & Publishing Association,* 177 N. Y. 131.) Under those circumstances an *innuendo* is essential to show the latent injurious meaning of the words. However, a publication not actionable *per se* cannot be made so by an innuendo. (*Morrison* v. *Smith,* 177 N. Y. 366; *Creelman* v. *Star Company,* 154 App. Div. 488.) When a publication is defamatory upon its face or its meaning is plain or unambiguous, no innuendo is required. (37 C. J. 23; Odgers Lib. & Sland. [5th ed.] 115.) It is the office of an innuendo to define the defamatory meaning which the plaintiff sets on the words to show how they come to have that defamatory meaning; and also to show how they relate to the plaintiff whenever that is not clear on the face of them, but an innuendo may not introduce new matter or enlarge the natural meaning of the words. It must not put upon the defendant's words a construction which they will not·bear. It cannot alter or extend the sense of the words or make that certain which is in fact uncertain. (Odgers Lib. & Sland. [5th ed.] 116; *James* v. *Rutlech,* 4 Rep. 17.)

Defendant argues that even if the words complained of are, in their natural meaning, libelous, plaintiff is bound by the innuendo alleged and may not recover on any other theory. In this, it seems to me, he is mistaken. The plaintiff cannot, during the progress of the cause, discard the innuendo in his pleading and start a fresh one not on the record. He must abide by the construction which he has put upon the words in his complaint. The plaintiff is not confined to the innuendo in his pleading. He may always fall fack on the natural and obvious meaning of the words. An innuendo may be treated as surplusage when it is used in connection with words that are unequivocal and actionable *per se* (Newell Sland. & Lib. [4th ed.] 590; *Carter* v. *Andrews,* 16 Pick. [Mass.] 1; 37 C. J. 25; *Cafferty* v. *Southern Tier Publishing Co.,* 226 N. Y. 87; *Morrison* v. *Smith, supra; Smith* v. *Buffalo Times, Inc.,* 124 Misc. 495; affd. 214 App. Div. 759; *McKee* v. *Robert,* 197 id. 842; *Hart* v. *Woodbury Dermatological Inst.,* 113 id. 281.)

A publication which imputes political corruption, or the use of political influence or privileges for pecuniary gain, is libelous *per se,* even though the party against whom the charge is made is not a public officer or a candidate for office. (36 C. J. 1172.) It is libelous to impute to anyone holding an office that he has been guilty of improper conduct in that office or has been actuated by wicked, corrupt or selfish motives, or is incompetent for the post which he holds. (Odgers Lib. & Sland. [5th ed.] 25.) Words which impute a want of integrity to anyone holding an office of confidence or trust, whether an office of profit or not, are clearly

actionable in themselves. (Newell Sland. & Lib. [4th ed.] 166.) Section 117 of the Federal Criminal Code (U. S. Code, tit. 18, Crim. Code and Crim. Pro. § 207; R. S. §§ 5501–5502, March 4, 1909, chap. 321; 35 U. S. Stat. at Large, 1109) makes it a crime for an officer of the United States or a person acting for or on behalf of the United States, in any official capacity, under or by virtue of any department or office of the government thereof, to ask, accept or receive any money or any contract, promise, undertaking, obligation, gratuity or security for the payment of money, or for the delivery or conveyance of anything of value with intent to have his decision or action on any question, matter, cause or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby. It is not necessary that one should technically be " an officer " of the United States in order to commit the offense defined by this section (*McGrath* v. *U. S.*, 275 Fed. 294, 301), as the express language of the statute makes it likewise applicable to " a person acting for or on behalf of the United States, in any official capacity." It applies to one who holds " a place of trust " as well as to one who holds a place of " profit." The acceptance of money by an official to influence advice and recommendations given to a superior, has been held to constitute a crime under this section. ( *U. S.* v. *Birdsall*, 233 U. S. 223.)

Under section 39 of the Federal Criminal Code (U. S. Code, tit. 18, Crim. Code and Crim. Pro. § 91; R. S. § 5451; 35 U. S. Stat. at Large, 1096), which makes it an offense to give or offer a bribe to such officers or persons, it has likewise been held that an unpaid official — a member of a local draft board — is an " officer of the United States " or " a person acting for or on behalf of the United States in an official function " within the meaning of that section. ( *U. S.* v. *Dordonaro*, 253 Fed. 477.)

When the article composed and published by the defendant is read in the light of the foregoing principles of law it seems to me that it is libelous *per se*. Certainly the language is calculated to injure plaintiff's reputation and to degrade him in public estimation. Because the publication complained of does not state an indictable offense under section 113 of the Federal Criminal Code, defendant's counsel argue that it is not libelous *per se*. We do not have to consider whether the conduct attributed to plaintiff does or does not constitute a crime. It is enough that the article clearly implies that plaintiff has acted hypocritically and corruptly in a position of public trust. (*Bennett* v. *Commercial Advertiser Assn.*, 230 N. Y. 125; *Powers* v. *Dubois*, 17 Wend. 63; *Weed* v. *Foster*, 11 Barb. 203; *Hoey* v. *New York Times Co.*, 138 App. Div.

149; *Lunn* v. *Littauer*, 187 id. 808; *Levey* v. *Brooklyn Union Publishing Co.*, 65 Misc. 373; affd., 137 App. Div. 947; *Mase* v. *Reilly*, 206 id. 434; *Alberta Publishing Co.* v. *Mumis*, 41 D. L. R. 422; *Myroft* v. *Sleight*, [1921] 90 L. J. K. B. 883.) The article complained of unmistakably conveys an accusation of corruption as well as hypocrisy; that plaintiff having assumed to act impartially for the public interest as chairman of the advisory board of the Department of Agriculture on the subject of game regulations has exerted his influence, an influence said to be " completely paramount " not for the public good but for the advantage of the gun-making companies whose " paid agent " he is said to be. (*Hamilton* v. *Eno*, 81 N. Y. 116; *Evans* v. *Star Company*, 205 App. Div. 311.) Defendant's statement clearly implies that plaintiff's official acts have been corruptly influenced. The refusal of the Secretary of Agriculture to reduce game bag limits and shorten open seasons is expressly attributed to the influence of the American Game Association of which plaintiff is president, and more directly to the personal influence of plaintiff himself. Plaintiff and his association are characterized as the " paid agents of the big corporations who make and sell guns and ammunition." The income of the association is said to be the " annual profits " of such manfacuturers. It is stated that plaintiff's association " seems to carefully refrain from publishing any public reports of receipts or disbursements " and that it has never " published a list of its sustainers " and that " it seems to be the only conservative organization which persistently hides all information of that kind." The meaning which the reader is intended to draw from these assertions is pointed by questions: " What is the source of the income of that American Game Protective Association? " and again, following the assertion that the association " seems to carefully refrain " from making public the sources of its income, by the further question, " Why is that? " It cannot be assumed that these statements and these queries were " intended and would be understood as complimentary or as innocent announcement." (*Klaw* v. *New York Trust Company, Ltd.*, 137 App. Div. 686; *Shubert* v. *Variety Company, Inc.*, 128 Misc. 428.) The entire article is its own best interpreter. The words used will be construed fairly by their natural import according to the ideas they were calculated and intended to convey to those to whom they were addressed, and pinned down to some one commonly accepted meaning, one generally understood, mindful always that language is as significant in suggestion as in expression. (*Diener* v. *Star-Chronicle Publishing Co.*, 230 Mo. 216.) The effect of the language, not its form, is the criterion by which to determine the actionable quality of the

words. (36 C. J. 1153.) It matters not how cleverly disguised the modes in which the meaning is concealed, if it is in fact defamatory. The court should be as vigilant in discovery as the libeler is artful in concealment. The libel may lurk in invective, in sarcasm and in ironical statements, often the fittest weapons that can be employed in blasting reputation. It may be adroitly veiled in questions so framed as to indicate the affirmance of a fact. A defamatory charge may be insinuated in questions. (Odgers Lib. & Sland. [5th ed.] 145; *R.* v. *Gathercole,* 2 Lew. C. C. 237–255; Newell Sland. & Libel [4th ed.] 270.) Almost a century ago it was said in *Gorham* v. *Ives* (2 Wend. 536): " The charge need not be couched in direct and positive terms. The imputation of crime may be as effectually made by way of interrogation as by affirmative allegation."

Therefore, this complaint states a good cause of action.

In his first affirmative defense the defendant has combined the plea of fair and justifiable comment on a matter of public interest with a plea of qualified privilege. This he cannot do. Each defense should be separately stated and numbered. (Rules Civ. Prac. rule 90; Civ. Prac. Act, § 261; *Stern* v. *Marcuse,* 119 App. Div. 478; *Morron* v. *Bryce,* 162 id. 466; *International Railway Co.* v. *Jaggard,* 204 id. 67.) The defenses of fair comment and privilege are not identical. In the latter case the words may be defamatory but the defamation is excused or justified by reason of the occasion; while in the former case, the words are not defamation of the plaintiff, and hence not libelous — the stricture or criticism is not upon the person himself, but upon his work. (Newell Sland. & Lib. [4th ed.] 519.) A further distinction is pointed out in the following quotation from the opinion in *Merivale* v. *Carson* (20 Q. B. Div. 275): " A privileged occcasion is one on which the privileged person is entitled to do something which no one who is not within the privilege is entitled to do on that occasion. A person in such a position may say or write about another person things which no other person in the kingdom can be allowed to say or write. But in the case of a criticism upon a published work, every person in the kingdom is entitled to do, and is forbidden to do, exactly the same things, and, therefore, the occasion is not privileged."

The public acts of public men, especially in the absence of express malice, are the subject of fair comment and criticism by people generally. It is the right of every one, not the privilege of any one, to comment fairly and honestly on matters of public importance. The right to comment or criticise does not embrace the right to make false, defamatory statements importing a criminal offense or

a moral delinquency. (36 C. J. 1285.) Unlawful defamation begins where lawful criticism ends. The words complained of here are not opinion or comment but statements of fact. Fair comment cannot be pleaded when the publication on its face consists of statements of fact (*Sherman* v. *International Publications, Inc.*, 214 App. Div. 437) nor is it available as a defense when the character and motives of a public official have been attacked in the public press. (*Sherman* v. *International Publications, Inc., supra; Hoey* v. *New York Times Co., supra*; 36 C. J. 1282; Newell Sland. & Lib. [4th ed.] 522; Odgers Lib. & Sland. [5th ed.] 196–198; *Popham* v. *Pickburn*, 7 H. & N. 898; *Bingham* v. *Gaynor*, 203 N. Y. 27; *Hamilton* v. *Eno, supra*.) The defendant's words were not privileged and the right of self defense cannot be invoked to excuse a libel which is not on its face a retort and which makes no reference to any occasion or need of self defense. (*Maynard* v. *Beardsley*, 7 Wend. 560.)

The justification must be as broad as the charge and must justify the precise charge. (*Bingham* v. *Gaynor, supra;* Odgers Lib. & Sland. [5th ed.] 181.) The libelous implications and insinuations as well as the direct accusations must be justified. (*Morgan* v. *Rep. Pub. Co.*, 249 Mass. 388; Odgers Lib. & Sland [5th ed.] 638.) The defendant's attempted justification falls short of meeting these requirements. This defense is clearly insufficient because of its failure to substantiate the imputations of hypocrisy and corruption which the article complained of conveys — its failure to justify the real sting of the libel. (*Abell* v. *Cornwall Industrial Corp.*, 241 N. Y. 327; *Roberts* v. *Brown*, 10 Bing. 519.)

All the facts set up in the defense of justification are realleged in mitigation of damages as the third defense. These matters are irrelevant and should be stricken out. Nowhere is it alleged in this defense that these matters were known to the defendant when he published the statement. Unless such knowledge is alleged (*Dolevin* v. *Wilder*, 34 How. Pr. 488) and proved (*Carpenter* v. *New York Evening Journal Publishing Co.*, 96 App. Div. 376) evidence of these facts cannot be received in mitigation. The matter set forth in this defense cannot be proved as tending to show the truth of the charge of official dishonesty. (*Mattice* v. *Wilcox*, 147 N. Y. 624; *Hamilton* v. *Eno, supra*.) The repetition in the final defense of the facts which appear in each of the preceding defenses is redundant and prejudicial. (*Pullen* v. *Seaboard Trading Co.*, 165 App. Div. 117.) All the allegations in this defense which tend to show a disclaimer of an intention to defame the plaintiff are immaterial. In actions for defamation it is immaterial what meaning the speaker intended to convey. He may have

spoken without any intention of injuring another's reputation, but if he has in fact done so, he must compensate the party. Words cannot be construed according to the secret intent of the speaker. The slander and the damage consist in the apprehension of the hearers. (Newell Sland. & Lib. [4th ed.] 301.)

In a libel action where the real issues relate to matters of personal integrity, the retention in the pleadings of evidentiary, redundant and irrelevant allegations which open wide the door to a discussion of the merits of a highly controversial subject, it seems to me, would necessarily prejudice a fair trial of the cause and distract the attention of the jury. Furthermore, the harm which such improper allegations may do is largely accomplished when they have been referred to and commented upon in the opening. Although the evidence in support thereof may be rejected and the jury properly cautioned, nevertheless, the impression remains and is likely to be reflected in the final result. In libel actions it is the duty of the court to strike from the pleadings prejudicial matter. (*Sherman* v. *International Publications, Inc., supra; Schieffelin* v. *Hylan,* 178 N. Y. Supp. 652; affd., 190 App. Div. 903; *Wuensch* v. *Morning Journal Association,* 4 id. 110.)

The first and second defenses are, therefore, stricken out as insufficient in law and defendant is directed to serve an amended answer omitting from the remaining defenses the repetitious, irrelevant and prejudicial matter referred to in the notice of motion, with costs to plaintiff.